RIPPLE and others *against* RIPPLE and others.

APPEAL.

The laws of another state, a member of the Union, are to be proved as the laws of a foreign country.

The maxim *omnia presumuntur rite esse acta*, is as applicable to judicial proceedings in such a state, as to those in our own.

Those who take an estate under a defective conveyance, are estopped from denying its validity.

Although land devised is not expressly charged with the maintenance of infirm children of the testator, yet, if such an intention can be clearly collected from all the parts of the will, considered in reference to the testator's circumstances, the charge will attach upon the land, and follow it into the hands of subsequent purchasers.

What is a sufficient notice of such a charge to affect subsequent purchasers.

The court inclined to think, that paupers, supported by the township, might unite with the overseers of the poor in an ejectment; but at any rate, refused to grant a new trial on that ground.

APPEAL from the Circuit Court of *Huntingdon* county, held by SMITH, J., *August* 18th, 1828.

The action removed from the Court of Common Pleas, was an ejectment for a tract of land in *Springfield* township, brought by *Elizabeth Ripple*, and *Catharine Ripple*, and the overseers of the poor of *Shirley* township against *Peter Ripple*, *John Cook*, and *Charles M'Gee*. The two women were idiots, the daughters of *Philip Ripple*, and were supported by the township. Their father being desirous of purchasing the tract of land in question, wrote a letter, dated *February* 8th, 1813, directed to his brothers-in-law, *John Shaver* and *Peter Shaver*, sons of *Nicholas Shaver*, who had been owner of the property, intimating his desire to make the purchase, and authorizing his son *John*, the bearer of the letter, to conclude the bargain; but, before the return of the son, the father sickened and died. His will bore date *February* 15th, 1813, and appeared to have been proved on the twenty-third of the same month, in the County Court of *Jefferson* county, *Virginia*, where the testator resided. The probate was certified by the clerk of the court, under his official seal, and the presiding justice of the same court, certified under his hand and seal, that the individual was clerk of the said court, and that his attestation was in due form of law.

The will, so far as it is material to the present case, was in these words:—"*First.* It is my will, and I desire that the articles of agreement that I entered into with *George Reynolds*, sen. on the 8th day of *February*, 1813, for the premises I live on, and the other articles therein mentioned, shall be complied with by my executors hereinafter mentioned.

(Ripple and others *v.* Ripple and others.)

"*Item.* And if my son *John* should have articled for the land that belonged to my father-in-law, according to a letter I wrote to the executors of his estate, it is my will, that the title is to be made in manner and form as follows, that is, if he has articled for the two places I wrote to them I wished to purchase, the tract on which my father-in-law lives; it is my will that the title should be made to my sons *John* and *Philip;* the title for one-fourth part of the said tract, at the upper end, is to be made to my son *John,* his heirs, and assigns for ever, and the other three parts is to be made to my son *Philip,* his heirs and assigns, for ever. And my son *John* is to pay two hundred and eighty pounds towards the said lands; and, *my son Philip is to keep and provide for my beloved wife, and my two eldest daughters, Catharine and Elizabeth, during their natural lives.* And my son *John* is to have my wife's share of her father's moveable estate, to be paid in part of the two hundred and eighty pounds that he is to pay towards the said land. It is my will, that if my son *John* has articled for the other place, directed in my letter, the title for the said lands is to be made to my sons *Peter* and *Lewis,* them, and their heirs, and assigns, for ever. And the said *Peter* and *Lewis* is to pay my youngest daughter, *Susanna,* eighteen pounds every year, until she arrives to the age of eighteen years; my sons *Peter* and *Lewis* is to pay three hundred pounds to her, her heirs, and assigns; and, if the last-mentioned tract should not be purchased, the money left of my estate, after paying for the first-mentioned tract, is to be equally divided between my sons *Peter* and *Lewis,* and my daughter *Susanna;* and if neither of the tracts are not purchased by my son, according to my letter, the articles first-mentioned between me and *Reynolds,* is to be null and void; and the place whereon I now live, is to be held by my beloved wife and children until my youngest arrives to her lawful age, and then it is my will, that it shall be sold by my executors, and divided as follows, in the manner and proportions I had allotted the lands to be divided: the tract on which my father-in-law lived was supposed to contain two hundred and sixty acres, at eighteen dollars per acre, and the other place was supposed to contain the same number of acres, at ten dollars per acre; and if my son should have made the purchase herein mentioned, it is my will, that all my moveable property shall be sold, excepting, &c., and the money arising from the sale of my moveable property, is to pay my debts, and the residue, if any, after my debts are paid, is to be appropriated to the paying for the lands herein mentioned. It is my will, and also my meaning, that the place whereon I now live, is to be held under the above conditions, (that is to say,) that my son *Philip* is to work the land, and pay a rent of one-third, for the use of my beloved wife and three daughters herein named. It is my will, that *Martin Bellmire* and *George Reynolds,* jr, be my executors," &c.

An article of agreement, dated *February* ; 1813, between *Peter*

(Ripple and others *v.* Ripple and others.)

*Shaver* and *John Shaver* of the one part, and *Philip Ripple* of the other, (not signed,) for the sale of the premises in question, was next given in evidence, though objected to by the defendants' counsel. After the death of old *Philip Ripple*, an agreement for the sale of the place was entered into between *P.* and *J. Shaver*, as administrators of *Nicholas Shaver*, and *Martin Bellmire* and *George Reynolds*, executors of *Philip Ripple*, dated *March* 3d, 1813, the reading of which was objected to by the defendants, but admitted by the court. The purchase money was paid by the executors of *Philip Ripple* to the administrators of *Nicholas Shaver*, whose heirs afterwards, in pursuance of the last-mentioned agreement, executed a deed for the premises to *Philip Ripple*, the devisee. *Philip Ripple* leased the property to *Peter Ripple*, who was "to keep the two girls, *Catharine* and *Elizabeth Ripple*." On the 4th of *March*, 1820, judgment was obtained by one *John Borker* against *Philip Ripple*, son of the testator; and, on the 20th of *May*, in the same year, *Cook* and *M'Gee* also obtained judgments against him, on which they proceeded to execution and sale, became the purchasers, and received a deed-poll from the sheriff. Notice was publicly given at the time of the sale, and previously to it, that the land was liable to the maintenance of the two females. The manner in which notice was given, is stated by the Chief Justice, in giving the opinion of the court, and, therefore, need not be repeated here.

Several exceptions were taken to the charge of His Honour, as well as to the admission of certain parts of the evidence. The jury found a verdict for the plaintiffs, "to be released on the payment of six hundred and forty-one dollars and ninety-nine cents, already expended in the support of *Catharine* and *Elizabeth Ripple*, and on the maintenance and support of the said *Catharine* and *Elizabeth* by the defendants, *John Cook* and *Charles M'Gee*."

After an ineffectual attempt to obtain a new trial, the defendants appealed to this court, where *Miles*, for the appellant, contended, that the will of *Philip Ripple* was improperly admitted in evidence. Our act of assembly requires, that the probate of a will, executed out of the state, shall be made before persons *having authority* to take probates of wills, &c., and it was not shown, as it ought to have been, that the court of *Jefferson* county had any such authority.

2d. The articles of agreement ought not to have been received in evidence. It did not appear that *Peter Shaver* and *John Shaver*, administrators of *Nicholas Shaver*, had any authority as such, to pass the land to any person whatever. The will of *Philip Ripple* was not to operate upon the land, unless his son *John* had entered into valid articles for the purpose, prior to the death of the testator.

3d. The will is not sufficient to charge the land in the hands of *Philip*. No provision is made out of the land as a *fund*.

4th. The notice at the time of the sheriff's sale was insufficient, not having come from the very party in interest. *Sugd. on Vend.* 532. But if the notice were given by the proper parties, it was not

(Ripple and others *v*, Ripple and others.)

full and sufficient. *Purd.* 390. 4 *Dall.* 320. There was a regular chain of title on record, of which the will was no part; and, therefore, the notice was not sufficient to lead to full knowledge. *Peebles* v. *Reading*, 8 *Serg. & Rawle*, 495. The question of notice is matter of law. On this point he also cited, *The Bank of North America* v. *Fitzsimons*, 3 *Binn.* 361. *Semple* v. *Burd*, 7 *Serg. & Rawle*, 291.

5. The action is improperly brought in the names of the paupers, and of the overseers of the poor. After the paupers were settled in, and supported by the township, the title wholly vested in the overseers of the poor. The two females cannot support an action jointly with the overseers. *Purd.* 683.

*Blanchard* and *Potter*, contra, were stopped by the court.

The opinion of the court was delivered by

GIBSON, C. J.—The certificate of the presiding justice of *Jefferson* county, that the attestation of the clerk is in due form of law, was sufficient to introduce the exemplification of the will. The laws of *Virginia* are to be proved as the laws of a foreign country; but, the acts of its courts may, undoubtedly, be resorted to for their exposition. To the act of the county court, in holding jurisdiction of the subject of probate, the maxim *omnia presumuntur rite esse acta*, is as applicable as it is to judicial proceedings in our own state.

The articles of agreement were competent evidence, because they constitute a part of the title under which all parties claim; and, it is, therefore, immaterial, whether the executors derived an authority to complete the purchase under the will. Having ratified their acts by taking the estate subject to the provisions of the will, *Philip*, or *any one claiming under him*, is estopped from denying their authority.

The intention to charge the premises with the maintenance of the testator's daughters, *Catharine* and *Elizabeth*, although not expressed in terms, is, nevertheless, clear and satisfactory. It is to be collected from all the parts of the will considered in reference to the testator's circumstances. Having articled for the sale of the mansion place in *Virginia*, he sends his son to *Pennsylvania* to purchase the premises in dispute; but before his return, sickens, makes his will, and dies. He provides contingently for the projected purchase, by directing his executors, in case it should be effected, to execute the contract for the sale of the mansion place; and he devises the premises in question to his son *Philip*, coupled with this clause:—" My son *Philip* is to keep and provide for my wife and my two oldest daughters, *Catharine* and *Elizabeth*, during their natural lives." He also provides for the failure of the contemplated purchase, by forbidding the executors, in that event, to complete the sale of the mansion place, and by directing, that it be held by his wife and children till the youngest come of age, *Philip* working the land, and rendering a third of the produce for their

(Ripple and others *v.* Ripple and others.)

use. He further directs the place to be sold when the youngest shall have come of age, and the proceeds to be distributed in the same proportions, and among the same persons to whom the land expected to be purchased by his son, would have gone. Thus, the premises in dispute were to be a substitute for the mansion place, which was expressly charged with the maintenance of the widow and children, while such a charge should not be in the way of the testator's ulterior arrangements in respect of distribution. But as regards the premises in dispute, there are no arrangements which are inconsistent with an indefinite continuance of such a charge; and there is, therefore, no reason why his views in regard of the premises, should be, in any respect, different from those he entertained in regard to the mansion place. The gift to *Philip* was on a condition which, in consequence of its very nature, adhered to the land. A legacy may undoubtedly be charged on the land by implication, as was done in *Nichols* v. *Postlethwaite,* 2 *Dall.* 131; *Hassanclever* v. *Tucker,* 2 *Binn.* 526; *Witman* v. *Norton,* 6 *Binn.* 395, and *Dobbins* v. *Stevens,* 17 *Serg. & Rawle,* 13. No form of words is necessary to produce the effect; and, where the intent is manifest, courts are bound to carry it into execution. There were powerful motives for such an intention here. The subsequent insolvency and death of *Philip,* have shown, that his personal responsibility would have been an unsafe pledge for the performance of his duties to his sisters. No father would consent to commit the maintenance of his daughters, in all the helplessness of idiocy, to a security so precarious.

Pursuant to the instructions of the testator, his son agreed with the vendors on the terms of the purchase, but did not enter into articles agreeably to the letter of the condition on which the land was to pass by the will; and it was nevertheless agreed on all hands, that the executors should complete the purchase as if articles had been executed. Accordingly, they paid the purchase money, and the vendors executed a conveyance to *Philip,* according to the testator's directions. Hence, as the defendants claiming under *Philip,* derive the legal estate directly from the vendors, and not through the will, it was necessary to affect them with notice of the equitable incumbrance of the daughters' maintenance. To this end, it was proved, that an uncle of the daughters, and an inhabitant actually rated in the township in which they are settled, gave actual notice to one of them at the sale, and to the other a short time previous, the third being merely a tenant. In addition, it was shown, that another rateable inhabitant of the same township, had not only informed them of the existence of the incumbrance, but had repeated to them nearly the words of the will by which it was created. Now, although a purchaser may disregard rumours, set afloat by those who have no right to intermeddle, he is bound to attend to the admonitions of a party in interest. Here the daughters, although actually charged to the township, had an interest of their

(Ripple and others *v.* Ripple and others.)

own, from attending to which, they were disabled by idiocy; and, surely one so near in blood as an uncle, might lawfully interpose for their protection. The overseers may also interpose; but, as they may be ignorant of the rights or claims of the paupers committed to their charge, every rateable inhabitant has an interest which renders him competent to act in the matter for the common good. The information given was full, direct, explicit, and amply sufficient to put the purchasers on an inquiry, which, had it been pursued, would have terminated in a perfect knowledge of all the circumstances.

The concluding objection is to the joinder of the overseers and the paupers in the same ejectment. By the act of the 29th of *March*, 1819, overseers of the poor are empowered to recover the money, or other property, of paupers committed to their charge, for the purpose of applying it to their maintenance; but, whether in their corporate name, or in the name of the pauper, is not specified. Perhaps an action would lie in the name of either. But, it is said, that whichsoever way it be taken, there cannot be an action in the names of both. By the act of the 31st of *March*, 1823, it is provided, that in ejectments by more than one, a plaintiff failing to establish his title, may become nonsuit, and a verdict nevertheless pass for the others. Now, had the overseers, or the paupers, become nonsuit here, the case would have been within the letter of the act. Even as it stands, it is so entirely within its spirit, that we would not exercise a sound discretion, were we to say, it is unsustainable. All parties are, in fact, interested: the overseers, in the application of the property in ease of the township; and, the paupers, to be let into the enjoyment of their father's bounty. They have thus an interest in common, which entitles them to the possession. But, were all this otherwise, we ought not to use our discretion so as to trip up the parties really entitled, on a trifling objection to the form of the action.

TOD, J. having been concerned as counsel, took no part in the decision.

Judgment affirmed.